## Case No. 16,227.
### UNITED STATES v. SAWYER.
[1 Gall. 86.] [1]

Circuit Court, D. Massachusetts. May Term, 1812.

NONINTERCOURSE LAWS—ACTION ON BOND—OYER OF BOND—PLEA OF PERFORMANCE—PRACTICE—CIRCUIT COURTS—ERROR TO DISTRICT COURTS—REVERSAL.

1. Under the 13th section of the act of March 1, 1809, c. 91 [2 Story's Laws, 1118; 2 Stat.

[1] [Reported by John Gallison, Esq.]

531, c. 24], a bond is well taken which includes in its condition a stipulation to produce at the collector's office within six months the certificate, &c., required by that section. Quære, whether a bond voluntarily given under such section, with a condition different from that required by law, would be wholly void. Oyer of a bond does not include oyer of its condition; nor e converso. If oyer is wanted, it must be prayed of each.
[Cited in Bank of U. S. v. Brent, Case No. 910; U. S. v. Brown, Id. 14,663.]

2. If the defendant, on oyer, does not set out the whole of the bond, the plaintiff may relieve himself by praying it to be enrolled.

3. The court will go back to the first error in the pleadings, and give judgment accordingly.

4. If a plea of performance be too narrow, or contain a flat negative pregnant, it is bad.
[Cited in Jackson v. Rundlet, Case No. 7,145.]

5. A plea seeking to avoid a bond for being illegally taken, colore officii, should specially state all the facts which show that illegality.
[Cited in Jackson v. Simonton, Case No. 7,-147.]
[Cited in Atchison & N. R. Co. v. Miller, 16 Neb. 665, 21 N. W. 451.]

6. On a reversal of judgment in an action brought by writ of error from the district court of Maine, the circuit court may, if justice require, award a venire facias de novo triable at the bar of the circuit court.
[Cited in U. S. v. Webber, Case No. 16,656.]
[Cited in Hillsborough v. Deering, 4 N. H. 96, 97.]

[Error to the district court of the United States for the district of Maine.]

The original action was debt by the United States, against the defendant in error [Abner Sawyer, Jr.], on a bond dated on the 17th March, 1809, for $3,746. The defendant craved oyer of the condition of the bond; and upon oyer granted, the condition appeared to be in the following words: "Whereas, the following goods, wares, and merchandize, that is to say, 130 thousand feet of boards, 9 thousand red oak hogshead staves, 100 thousand shingles, 150 red oak hogshead shooks, 15 quintals of fish in 20 boxes, as per manifest, now delivered to the collector of the customs for the district of Saco, are intended to be exported in the said vessel, called the Romeo, burthen 179 tons, to the island of St. Bartholomews. Now the condition of this obligation is such, that if the said vessel shall not leave the port without a clearance, nor shall, when leaving the port, proceed to any port or place in Great Britain or France, or in the colonies or dependencies of either, or in the actual possession of either, nor be directly or indirectly engaged during the voyage in any trade with such port, nor shall put any article on board of any other vessel; and if the certificate and other proofs, required by law, of the landing of the whole cargo of the said vessel at the aforesaid island of St. Bartholomews, or at any other island or place other than Great Britain or France, or the colonies or dependencies of either, or in the actual possession of either, shall be produced at this office within six months from the date hereof, then

this obligation shall be void, otherwise," &c.

The defendant then pleaded in bar of the action several pleas: (1) "That said vessel did not leave the port of Saco aforesaid, without a clearance; that when leaving the port, she did not proceed to any port or place in Great Britain or France, or in the colonies or dependencies of either, or in the actual possession of either, during said voyage; that she was not directly or indirectly engaged during the said voyage, in any trade with such port; that she did not put any article on board of any other vessel; that said vessel returned from said voyage, and arrived at said port of Saco on the 26th June, 1809, and not before; he having before that time sold and delivered said cargo at said island of St. Bartholomews, pursuant to the condition of said writing; and then and there presented to the collector of said port of Saco a certificate of the sale and delivery of said cargo at said island; but which being informal, was objected to by said collector and refused; all which he is ready to verify," &c. To this plea the United States replied, "that the said vessel, in the writing obligatory aforesaid mentioned, after having departed, as aforesaid, from the port and district of Saco aforesaid, and touching at the island of St. Bartholomews aforesaid, proceeded to a port or place in a colony, province, or dependency of Great Britain, that is to say, of the king of the United Kingdoms of Great Britain and Ireland, to wit, the island of Grenada in the West Indies, said island not being a permitted port, and there delivered her said cargo, contrary to the condition of said writing obligatory, and the laws and statutes of said states, in such cases made and provided, and this they are ready," &c. The defendant rejoined, "protesting that said vessel did not proceed from said island of St. Bartholomews to said island of Grenada, or to any other island, port, or place within any colony or dependency of the United Kingdoms of Great Britain and Ireland, or of France, contrary to the condition of said writing declared on, and the laws of the United States; for rejoinder said, that the said vessel did pursue her voyage to, and arrived at said island of St. Bartholomews, and in the harbor thereof, and then and there duly entered said vessel at the custom-house, and remained five days; and this he is ready," &c. The United States sur-rejoinded, "that after the said vessel had arrived at the island of St. Bartholomews as aforesaid, viz. on the 1st day of May, 1809, the said vessel did proceed from thence to a port or place in the island of Grenada, in the West Indies, the same island of Grenada being a province, colony and dependency of Great Britain, that is to say, of the king of the United Kingdoms of Great Britain and Ireland, and afterwards arrived at said island of Grenada, and there delivered her cargo aforesaid, viz., at Portland aforesaid, con-trary to the condition of said writing obligatory, and the statutes aforesaid, and this the plaintiffs are ready to verify," &c. To this sur-rejoinder the defendant demurred, and the United States joined in the demurrer. (2) For a second plea, the defendant pleaded, "that the writing aforesaid declared on, was demanded and received by said collector of said port of Saco of him the said defendant, by color of his, said collector's, office, and that the condition of said writing is not conformable to, or in pursuance of the statute of the United States in such case made and provided; and this he is ready to verify," &c. The United States replied, "that the condition of said writing, in the form that the same was taken, is conformable to and in pursuance of the statutes of the United States aforesaid, in such case provided; and this the plaintiffs pray may be inquired of by the court." The defendant rejoined, "and the said Sawyer likewise." (3) There was a third plea and replication thereto, which need not now be stated. The rejoinder averred, that said vessel did not depart from said island of St. Bartholomews, and proceed with said cargo to a port or place in said island of Grenada, and tendered an issue to the country, which was joined by the United States. This issue was never tried in the court below. The judgment of the court, as stated upon the record, is: "It appears to the court, that the condition of the writing declared on, is conformable to, and in pursuance of the law in such case made and provided, as alleged in the replication to the second plea in bar; and it is the opinion of the court, that the plaintiff's sur-rejoinder to the first plea in bar is bad and insufficient in law. It is, therefore considered by the court here, that the United States take nothing by their writ."

G. Blake, for plaintiff in error.
C. Jackson, for defendant in error.

STORY, Circuit Justice. It is exceedingly to be regretted, that this case comes before the court upon pleadings so informally and incorrectly drawn, and to add to our embarrassment, though a question arises upon the bond, as to its legality, the condition only is spread upon the record. Oyer of the condition of the bond only is prayed, and it is very clear that the oyer of that does not entitle the party to oyer of the bond itself; but it must be demanded of both, if wanted (Cook v. Remington, 6 Mod. 237), for the bond and condition are considered as distinct, the bond being complete without the condition, and oyer may be of one without the other (Cabell v. Vaughan, 1 Saund. 289, 290; 1 Saund. 9b, note 1). The plaintiffs might, indeed, by praying in their replication, that the bond might be enrolled, have relieved us from this difficulty; but they have not so done, and we are left to conjec-

ture what are the contents of the bond itself, unless so far as the declaration states them, though the condition has a manifest reference to them.

I will now consider the various questions, which arise out of the pleadings and record, as they have been presented to the court. The bond is dated the 17th of March, 1809, and the writ was sued on the 18th, and served on the 21st of November, of the same year. Of course more than six months had elapsed before the commencement of the action. I am very well satisfied, that the sur-rejoinder of the plaintiffs to the first set of pleadings is bad, because it contains no matter, that had not been averred before, and was a mere evasion of the rejoinder. But, supposing it to be bad, the court will proceed to consider the other pleadings, and give judgment against the party committing the first fault. 4 Coke, 84; Cro. Eliz. 815; Strange, 302; Doug. 91, 94; 8 Coke, 120, 133b; Moore, 105, 269. It is not necessary to consider the rejoinder (though I have no doubt it is bad) or the replication, whatever may be the unskilfulness with which they are drawn, because, supposing the bond good in point of law, I am satisfied that the first plea is bad. That plea, after negativing any breach of the condition as to other parts, avers "that when leaving the port she (the vessel) did not proceed to any port or place in Great Britain or France, &c., during said voyage." Now this is a plain negative pregnant, and the words of the condition contain no such restriction, as during said voyage, nor is any voyage, on which the vessel was bound, particularly mentioned in the plea, nor otherwise stated, than in the recital of the condition of the bond, where it is said the goods mentioned in the manifest are intended to be exported in the Romeo to St. Bartholomews. The bond, whether well taken or not, is admitted to have been taken under the authority of the 13th section of the act of March 1, 1809 (chapter 91). Now, if by "during said voyage," were meant a voyage from the United States to St. Bartholomew, and back again to the United States, it ought to have been averred in the plea, that such was the voyage, and, perhaps, such a limitation, to wit, to the whole voyage, homeward as well as outward, would be a reasonable limitation of the language of the act. However, as to this, I give no opinion. It is very clear to my mind, that the words of the act, embraced in this part of the condition, comprise a single and distinct provision, and do not connect with the next ensuing clause, so as to make the words in that clause, "during the voyage," ride over both clauses, even if the court should restrict these words to the outward voyage only. On the contrary, each is a single and substantive condition. Any other construction would defeat the manifest intent of the whole act, and I know of no rule, by which a court are authorized to interpose a limitation, where the law has placed none,

when the purposes of the law would thereby not only not be furthered, but would be completely frustrated. The object of the act was to interdict all commerce with Great Britain and France, and their dependencies. Now, if the mere proceeding to a permitted port, in the outward voyage stated in the bond, was a complete fulfilment of the condition, although the vessel and cargo ultimately proceeded to a prohibited port, the whole security and purpose of the bond would be completely destroyed. It is, undoubtedly, true, that if the legislative intent were clearly or by necessary inference expressed to this effect, it would be our duty to disregard all subordinate inconveniences. But we are asked to restrain a condition, where the law has used general terms, to exclude cases, which are within the provision, and in manifest violation of the act. I am not bold enough to adopt such a construction. As, therefore, the plea in its most liberal construction only declares, that the vessel, during her voyage to St. Bartholomews did not proceed to a prohibited port, which is too narrow an allegation of performance, and is a flat negative pregnant, it is substantially bad. But even supposing this part of the plea were good, yet the plea itself contains no sufficient answer to that part of the condition, which requires a certificate according to the forms prescribed by law, for it admits that no such certificate was produced, but only an informal certificate, which was no compliance with the law. It follows, therefore, that the plea is bad, in this respect, and if so, then it is clearly bad for every other purpose, for performance should have been shown in omnibus. On this plea therefore the judgment of the court below ought to have been for the United States. And if this were not so, yet the replication alleged facts, which showed a complete breach, standing unaffected by the subsequent pleadings.

I now proceed to the second set of pleadings, which terminates in an issue to the court, praying them to inquire whether the said bond be conformable to and in pursuance of the statutes of the United States in such case made and provided. This is so novel a prayer, and comes in so questionable a shape, that it is difficult to know how it ought to be treated. The rules of pleading are founded in sound sense, and have been relaxed by the courts from time to time as far, and perhaps further, than public convenience has required. Such a relaxation has often tended to negligence on the part of the pleaders, and sometimes to embarrassment in the judgment of courts, impressed as they must be with the desire of doing justice, yet divided by the conflicting and irregular averments in the pleadings. The issue purports to be in form an issue of fact, and in substance an issue in law, to be tried by the court. There is no form or principle, which is known to the common law, that

can in the most remote degree countenance it, and we cannot support it here, unless we deliberately assent to the overthrow of all the principles of pleading. I am not prepared for such a determination, and have no hesitation in pronouncing the replication and rejoinder utterly insupportable. Had this been an original suit in this court, we should probably have decreed a repleader. But it has long been settled, that a court of error cannot award a repleader. 2 Saund. 319; Tidd, Prac. 813. The true mode of pleading would have been, to have spread the obligation and condition by oyer on the record, and if no other facts were necessary, to have demurred for the apparent illegality, and if other facts were necessary, to have averred them by way of plea.

As to the second plea, it is certainly very dry of averments. It does not state any voyage to be performed, any occasion on which the bond was required, or any demand made, or right refused under color of office previous to its execution. The allegations are, that it was demanded and received by the collector of Saco, by color of his office, and that the condition is not conformable to, or in pursuance of the statute of the United States in such case made and provided. Now certainly it is no objection to a legal bond, that it is taken colore officii, and it is quite impossible to say, whether a bond is taken conformable to a statute provided for a special case, unless the court can know, from the pleadings and record, what that case is. The present plea states no case, and alleges no illegal execution of the bond. The illegality, as stated in the plea, consists in the demand and receipt after the execution of it. If the bond were therefore good in its inception, and for aught that appears in the plea, it was so, no subsequent demand and receipt by the collector could ipso facto avoid it.

But notwithstanding the insufficiency of this plea to avoid the bond, yet as oyer of the condition has been demanded and had, the condition becomes, not as has been supposed, a part of the defendant's plea, but a part of the plaintiff's declaration. Com. Dig. "Pleading" (page 1); Carth. 513. Being, therefore, a part of the record, if upon the whole declaration it appears to the court, that the bond is void in law, judgment ought to be pronounced in favor of the defendant. 2 Term R. 669. But inasmuch as the bond itself is not on oyer spread before the court, and no specific facts are presented to show the occasion of giving the bond, the court cannot award such a judgment, if by possibility a single case could exist, in which the bond could be legally supported.

It has been argued on the part of the defendant, that the condition of this bond is not conformable to any prescribed by the laws of the United States, and that therefore it is void at law, because to every contract there must be two contracting parties, and the United States can contract only according to the regulations and authorities of statutes. The assent of the United States can be declared only through its authorized agents, and they cannot effectively assent, unless they are clothed with the authority by law. An assent, therefore, in a manner different from that prescribed by the law, is not valid, and consequently does not bind at all.

In the first place, let us consider whether the condition of this obligation is not conformable to the 13th section of the act of March 1, 1809, c. 91 [2 Story, Laws 1118; 2 Stat. 531, c. 24], for under that act it must in all probability have been taken. The 13th section is as follows: "That during the continuance of so much of the act laying an embargo on all ships and vessels in the ports and harbors of the United States, and of the several acts supplementary thereto, as is not repealed by this act, no ship or vessel bound to a foreign port, with which commercial intercourse shall, by virtue of this act, be again permitted, shall be allowed to depart for such port, unless the owner or owners, consignee or factor of such ship or vessel shall, with the master, have given bond, with one or more sureties to the United States, in a sum double the value of the vessel and cargo, if the vessel is wholly owned by a citizen or citizens of the United States; and in a sum four times the value, if the vessel is owned in part or in whole by any foreigner or foreigners, that the vessel shall not leave the port without a clearance, nor shall, when leaving the port, proceed to any port or place in Great Britain or France, or in the colonies, &c. of either, or in the actual possession of either, nor be directly or indirectly engaged, during the voyage, in any trade with such ports, nor shall put any article on board of any other vessel; nor unless every other requisite and provision of the second section of the act, entitled 'an act to enforce and make more effectual an act, entitled "an act laying an embargo," &c. and the several acts supplementary thereto,' shall have been complied with. And the party or parties to the above mentioned bond, shall, within a reasonable time after the date of the same, to be expressed in the said bond, produce to the collector of the district, from which the vessel shall have been cleared, a certificate of the landing of the same, in the same manner as is provided by law for the landing of goods exported with the privilege of draw-back; on failure whereof the bond shall be put in suit, and in every such suit judgment shall be given against the defendant or defendants, unless proof shall be produced of such relanding, or of loss at sea." Now it is admitted, that the condition conforms to that section in all parts, except the last clause, respecting the production of certificates, which it is argued is not authorized by the section. It is to be regretted, that the legislature on any occasion should express themselves in ambiguous terms; more especially it is to be

regretted, when the ambiguity arises out of laws highly penal. But courts are bound to take the laws as they find them, and to give a consistent construction, if possible, to every part of them. If the expressions admit of various constructions, they should adopt that which will effectuate the intention of the legislature, and avoid apparent absurdities. By this section, in order to entitle a vessel to depart for a foreign permitted port, it is one pre-requisite, that a bond should be given with conditions: (1) that the vessel shall not leave the port without a clearance; (2) nor shall, when leaving the port, proceed to any foreign prohibited port or place; (3) nor be directly or indirectly engaged, during the voyage, in any trade with such prohibited port; and (4) nor shall put any article on board of any other vessel. Another pre-requisite is a compliance with every other requisite and provision (by which undoubtedly is meant every other than the giving the bond) contained in the second section of the act of January 9, 1809, c. 72 [2 Story's Laws 1101; 2 Stat. 506, c. 5]. Now these requisites and provisions are, the lading the cargo under a permit from the collector, and also under the inspection of the proper revenue officers. Had the section stopped here, there would have been no room for doubt. But it then declares, "that the party or parties to the above-mentioned bond shall, within a reasonable time after the date of the same, to be expressed in the bond, produce to the collector, &c. a certificate of the landing of the same," &c.; on failure whereof the bond shall be put in suit, and judgment rendered against the defendant, unless proof shall be produced of such relanding or of loss at sea.

It is here required, that the time for producing the certificate shall be expressed in the bond. Now this can only be in the obligatory part, or in the condition. It is hardly conceivable that it should be put in the former, and it could be proper only in the latter. Further, on failure of producing the certificate of the landing of the cargo, the bond is to be put in suit,—why? If the producing of the certificate forms no part of the condition of the bond, it certainly could be no ground for a suit. Every other part of the condition of the bond may be fully performed, and yet the cargo never have been landed in a foreign port. The suit might therefore be altogether nugatory. But this is not all. The section further prescribes, that judgment in such suit shall be given against the defendant, unless proof is produced of a relanding, or of loss at sea. It would be in the highest degree unreasonable to presume, that the legislature would declare an obligation forfeited by the omission to produce proof of things not at all within the condition of such obligation. It would be equally absurd to suppose them to require something as a discharge of an obligation, which never could affect its terms one way or the other. Now if the goods were relanded, or were lost at sea, there

might have been a leaving of the port without a clearance, or a proceeding to a prohibited port, either of which would constitute a forfeiture of the bond. On the other hand, there might have been no departure without a clearance, nor proceeding to a foreign port, and yet the cargo might never have been relanded or lost at sea, and so the bond would be saved. When, therefore, the legislature prescribe, that the production of the certificate shall be expressed in the bond, it must mean, that it shall form a part of the condition of it; and when the nonproduction is declared to subject the bond to suit, and the defendant to judgment, it must mean, that the condition of the bond has been broken, and the judgment may rightfully be pronounced for the breach. I have therefore no doubt, that the condition of the present bond is a substantial compliance with the 13th section, and of course the whole foundation of the argument on this head fails. Judgment on this set of pleadings was therefore rightfully given for the United States.

Whether a bond voluntarily given to the United States can be avoided in any case, where it would be good and valid, if given to an individual? Whether such a bond, taken by a collector, under a general authority to take bonds in revenue cases, would be void on account of any irregularity or mistake in the condition? Whether such a bond, where the condition is partly conformable to, and partly variant from, the provisions of the statute, be void in whole, or good as to that part of the condition, which is conformable to law?—are questions, on which I give no opinion. It will be sufficient to decide such questions, when they arise; though with great deference I must suggest, that the principles, on which such bonds are to be adjudged wholly void, will encounter much opposition from the authority of decided cases. See Pigot's Case, 11 Coke, 27; African Co. v. Torrane, 6 Term R. 588; Morse v. Hodsdon, 5 Mass. 314; Bull. N. P. 171, 172; Rex v. Bradford, 2 Ld. Raym. 1327. See, also, Moore, 193, pl. 342; And. 129; 1 P. Wms. 181; Shep. Touch. 359, &c.; Com. v. Lacare, 2 Dall. [2 U. S.] 118. See later cases in courts of United States, and especially those in bonds given by public officers.

The third set of pleadings terminated in an issue to the country, which from the adjudication of the demurrer to the sur-rejoinder against the United States, became unnecessary to be tried in the district court. Tidd, Prac. 676; 1 Saund. 80, note 1. As I am of a different opinion on that point, it becomes an important inquiry, whether the cause can be remanded to be tried in the court below, or whether this court can issue a venire facias for the same purpose.

It has been argued by the counsel for the defendant, that this court, sitting as a court of error, cannot issue a venire facias de novo to try an issue of fact upon a reversal, where justice requires that it should be done. And Street v. Hopkinson, 2 Strange, 1055, and 1

Inst. 227, are cited in support of the position. And it has been farther contended upon the authority of Davies v. Pierce, 2 Term R. 53, 125, that the granting of a venire facias de novo, is of quite modern date, even in England. On examining the citation from 1 Inst. 227, I do not find that it bears at all upon the doctrine; but in the case from 2 Strange, 1055 (which is better reported in Cas. t. Hardw. 330), it was certainly held by Lord Hardwicke and the other judges of the king's bench, that a court of error could not award a venire facias de novo; and the reason assigned is, that no case could be found where it had been done, and it would be inconsistent to continue and transfer the proceedings of another court into a court of error. This reason is certainly by no means satisfactory. When the practice first began is perhaps not exactly ascertained; but about this very time, in Kynaston v. Mayor, etc., of Shrewsbury, 2 Strange, 1051, 7 Brown, Parl. Cas. 396, the house of lords awarded a venire facias de novo on error from the king's bench. The same award was soon afterwards made by the lords in Haswell v. Chalie, 2 Strange, 1124, and has continued downwards, as occasion has required. Lickbarrow v. Mason, 5 Term R. 367. Nor let it be supposed, that this was a peculiar authority, resting in the house of lords, for we have the authority of Lord Mansfield in Harwood v. Goodright, Cowp. 87, 89, that the lords could not as a court of error, have such jurisdiction, unless the court of king's bench had the same. But the doctrine does not rest on these adjudications, well founded as they are. In Grant v. Astle, 2 Doug. 722, on error from the common pleas, the court, on solemn consideration, awarded a new venire, and said, that there was no doubt, but it might be awarded by a court of error, and was not a new practice, and that upon inquiry, a great many cases had been found. The same doctrine has been uniformly recognised and adhered to by the king's bench ever since that time. Harwood v. Goodright, Cowp. 87; Bent v. Baker, 3 Term R. 27. And Davies v. Pierce, 2 Term R. 125, is a very strong authority to show the right, even upon error to a court sitting within another jurisdiction. In the state of New York, the practice invariably obtains (Brown v. Clark, 3 Johns. 443), and it has been deliberately adopted by the supreme court of Massachusetts (Keyes v. Stone, 5 Mass. 391; Wilson v. Mower. Id. 407). See, also, 2 Tidd, Prac. 776, 815; 3 J. P. Smith [Eng.] 39. I take the doctrine to be therefore incontrovertibly established, that at common law a court of error has a perfect jurisdiction to issue a venire facias de novo, whenever upon the record justice requires it.

I should not indeed have deemed it necessary to have examined this point so much at large (for at the argument I entertained no doubt on it) but for the total abandonment of it on the part of the United States. And it was certainly matter of surprise, that a doctrine so fully settled by authority, should have been yielded without an effort. But this authority, does not, as to the circuit court of the United States, depend altogether upon the common law, but is expressly given by statute. By the act of September 24, 1789, § 24 (1 Story's Laws, 63 [1 Stat. 85]), it is provided, "that when a judgment or decree shall be reversed in a circuit court, such court shall proceed to render such judgment or pass such decree, as the district court should have rendered or passed; and the supreme court shall do the same on reversals therein, except where the reversal is in favor of the plaintiff or petitioner in the original suit, and the damages to be assessed or matter to be decreed are uncertain, in which case they shall remand the cause for a final decision." If this court therefore are to render the judgment, that the district court ought to have rendered, then judgment must be, that the first and second pleas be adjudged bad; and that the third plea be tried by a jury. As there is a jury at the bar of this court, I do not perceive any necessity of remanding the cause to the district court, unless we are so required to do by the terms of the act. Now I think it very clear, that the exception in the latter clause of the above-mentioned act, is confined to the case of reversals in the supreme court, and does not apply to reversals in this court. The reason for remanding causes reversed in the supreme court was, that under the act of September 24, 1789 (chapter 20), no jury usually attended at that court; and upon writs of error in causes of equity or admiralty jurisdiction, the court could not examine any new evidence. Wiscart v. D'Auchy, 3 Dall. [3 U. S.] 321; Jennings v. The Perseverance, Id. 336. Whenever therefore the decision of the court below shuts out evidence necessary for the final decision of the cause, as to the plaintiff, no proper judgment could be given without remanding the cause for further proceedings. But the district court of the United States has no jurisdiction in equity causes; and in admiralty causes from that court, the revising power of the circuit court has always been exercised by way of appeal, which, according to well established principles, removes the cause for a hearing de novo, as well as to facts, as law. Yeaton v. U. S., 5 Cranch [9 U. S.] 281; Clerke, Praxis Adm. tit. 54. And in common law causes, this court can well try a cause at its own bar, as they have a jury for trials.

It has been urged, that the clauses in the 11th section of the act of 1789, which prohibit a person from being arrested in civil actions in one district for trial in another, or held to answer to process issuing from a court of any other district, than that wherein he is an inhabitant or commorant; by implication deny the right of this court to try causes from the district of Maine. But it is

a sufficient answer to the argument, that these clauses apply only to original process; and that the same act gives this court appellate jurisdiction by writ of error over the defendants in all such causes.

It has been further urged, that there is no express authority in the act to award a venire facias de novo. But I apprehend, that such an authority is the necessary result of the language of the 24th section. And even in cases not within the words of that section, as on reversals in favor of the defendant, on account of a defective special verdict, (Chesapeake Ins. Co. v. Stark, 6 Cranch [10 U. S.] 268; Livingston v. Maryland Ins. Co., Id. 274), or on a bill of exceptions (Hudson v. Guestier, Id. 285, note), the supreme court have awarded a venire facias de novo. This authority must have been exercised upon the construction of the 24th section of the act, or upon the general principles of the common law. In either case, it seems to me that the authority of the court could not be brought into question.

I am therefore of opinion, that the issue of fact, which was omitted to be tried in the court below [case unreported] should be tried by jury at the bar of this court. As the district judges concurs in this opinion, let the judgment be reversed, and a trial be ordered at the bar of this court.

Trial ordered at bar.

A trial on this issue was had at the subsequent term, and the jury found a verdict for defendant. [Case unreported.]